Attachment 1

| | |
|---|---|
| BOULDER COUNTY COMBINED COURT<br>STATE OF COLORADO<br><br>**Court Address:**<br>1777 6th Street<br>Boulder, Colorado 80302 | |
| **Plaintiff:**<br>Jorge Zamudio-Arredondo, a minor, by and<br>through his Mother and Next Friend, Luz<br>Arredondo Fierro<br><br>v. | |
| **Defendants:**<br>Centura Health Corporation d/b/a Avista<br>Adventist Hospital; Bessie McLaughlin O'Dea,<br>M.D.; Celia Tryon, R.N.; Michele J. Sevcik,<br>R.N.; and Michele N. Lewis, R.N. | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>James E. Puga, Esq., #18960<br>Alex R. Wilschke, Esq., #36323<br>Leventhal Puga Braley P.C.<br>950 South Cherry Street, Suite 600<br>Denver, Colorado 80246<br>Phone Number:   (303) 759-9945<br>FAX Number:    (303) 759-9692<br>E-mail:        jpuga@leventhal-law.com<br>            awilschke@leventhal-law.com | **Case Number:** 2019CV030693<br><br>**Division:** 5<br>**Courtroom:** L |

## SUMMONS FOR SERVICE ON DEFENDANT BESSIE MCLAUGHLIN O'DEA, M.D.

The People of the State of Colorado
To the Defendant(s) named above:     Bessie McLaughlin O'Dea, M.D.

You are hereby summoned and required to file with the clerk of this court an answer or other response to the attached complaint within twenty-one (21) days after this summons is served on you in the State of Colorado, or within thirty-five (35) days after this summons is served on you outside the State of Colorado.

If you fail to file your answer or other response to the complaint in writing within the applicable time period, judgment by default may be entered against you by the court for the relief demanded in the complaint, without any further notice to you. The following documents are also served with this summons: Complaint for Damages and Jury Demand; District Court Civil (CV) Case Cover

Sheet for Initial Pleading of Complaint, Counterclaim, Cross-Claim or Third Party Complaint and Jury Demand; and, Notice of Firm Name Change.

LEVENTHAL PUGA BRALEY P.C.

Date:   July 25, 2019          By:     /s/ Alex R. Wilschke
                                       James E. Puga, Esq., #18960
                                       Alex R. Wilschke, Esq., #36323
                                       *Attorneys for Plaintiff*

| | |
|---|---|
| **BOULDER COUNTY COMBINED COURT** **STATE OF COLORADO** | ~~DATE FILED: July 16, 2019 4:57 PM~~ FILING ID: 2EFD1D15B4731 CASE NUMBER: 2019CV30693 |
| **Court Address:** 1777 6th Street Boulder, Colorado 80302 | |
| **Plaintiff:** Jorge Zamudio-Arredondo, a minor, by and through his Mother and Next Friend, Luz Arredondo Fierro v. **Defendant:** Centura Health Corporation d/b/a Avista Adventist Hospital; Bessie McLaughlin O'Dea, M.D.; Celia Tryon, R.N.; Michele J. Sevcik, R.N.; and Michele N. Lewis, R.N. | **▲ COURT USE ONLY ▲** |
| **Attorneys for Plaintiff:** James E. Puga, Esq., #18960 Alex R. Wilschke, Esq., #36323 Leventhal & Puga, P.C. 950 South Cherry Street, Suite 600 Denver, Colorado 80246 Phone Number:  (303) 759-9945 FAX Number:  (303) 759-9692 E-mail:      jpuga@leventhal-law.com E-mail:      awilschke@leventhal-law.com | **Case Number:** **Division:** **Courtroom:** |
| **COMPLAINT FOR DAMAGES AND JURY DEMAND** | |

Plaintiff Jorge Zamudio-Arredondo, by and through his Mother and Next Friend, Luz Arredondo Fierro, and by and through his attorneys of record, Leventhal & Puga, P.C., respectfully submits the following Complaint for Damages and Jury Demand. As grounds, Plaintiff states as follows:

## I. CERTIFICATE OF REVIEW

Pursuant to C.R.S. § 13-20-602(3), counsel certifies as follows:

a.      Counsel has consulted with licensed professionals with expertise in the areas of the alleged negligent conduct as set forth in Plaintiff's Complaint;

| | |
|---|---|
| **BOULDER COUNTY COMBINED COURT** **STATE OF COLORADO** **Court Address:** 1777 6th Street Boulder, Colorado 80302 | |
| **Plaintiff:** Jorge Zamudio-Arredondo, a minor, by and through his Mother and Next Friend, Luz Arredondo Fierro v. **Defendants:** Centura Health Corporation d/b/a Avista Adventist Hospital; Bessie McLaughlin O'Dea, M.D.; Celia Tryon, R.N.; Michele J. Sevcik, R.N.; and Michele N. Lewis, R.N. | ▲ **COURT USE ONLY** ▲ |
| **Attorneys for Plaintiff:** James E. Puga, Esq., #18960 Alex R. Wilschke, Esq., #36323 Leventhal Puga Braley P.C. 950 South Cherry Street, Suite 600 Denver, Colorado 80246 Phone Number: (303) 759-9945 FAX Number: (303) 759-9692 E-mail: jpuga@leventhal-law.com awilschke@leventhal-law.com | **Case Number: 2019CV030693** **Division: 5** **Courtroom: L** |

## RETURN OF SERVICE – BESSIE MCLAUGHLIN O'DEA, M.D.

I declare under oath that, I am 18 years or older and not a party to the action and that I served the attached Summons for Service on Defendant Bessie McLaughlin O'Dea, M.D.; Complaint for Damages and Jury Demand; District Court Civil (CV) Case Cover Sheet for Initial Pleading of Complaint, Counterclaim, Cross-Claim or Third Party Complaint and Jury Demand; and, Notice of Firm Name Change, on _____ (Person named in this Subpoena or name of agent  served) in _____ (County) _____ (State) on _____(date) at  the following location:_____

Check one:
☐ By handing it to a person identified to me as _____
_____ or by leaving it with the named person who refused service.
☐ I attempted to serve the person named in this subpoena on _____ occasions but have not been able to locate the named person.
Check one:
☐ Private process server
☐ Sheriff, _____County

　　Fee $ _____Mileage $ _____

My Commission Expires: _____

_____
Signature of Process Server

_____
Name (Print or type)

_____
Notary Public /Deputy Clerk  Date

b.      The licensed professionals who have been consulted have reviewed the known facts relevant to the allegations of negligent conduct as set forth in Plaintiff's Complaint;

c.      Based upon review of such facts, the licensed professionals have concluded that the filing of the claims against the Defendants does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and,

d.      The licensed professionals meet the requirements set forth in C.R.S. § 13-64-401.

## II. CERTIFICATION CONCERNING SIMPLIFIED CIVIL PROCEDURES PURSUANT TO C.R.C.P. 16.1

Plaintiff Jorge Zamudio-Arredondo, by and through his Mother and Next Friend, Luz Arredondo Fierro, through his attorneys, Leventhal & Puga, P.C., hereby certify that Plaintiff's claims against the Defendant exceeds $100,000 inclusive of any statutory or contractual attorney fees, penalties, or punitive damages, but exclusive of interest and costs. Therefore, pursuant to C.R.C.P. 16.1(b)(2), Plaintiff opts out of the simplified procedures described in C.R.C.P. 16.1.

## III. PARTIES, JURISDICTION AND VENUE

1.      Luz Arredondo Fierro, mother and next friend of Jorge Zamudio-Arredondo, a minor, was a resident of the State of Colorado during all relevant times.

2.      On March 21, 2019, Luz Arredondo Fierro (hereinafter "Luz Arredondo") renounced, relinquished and assigned all claims relating to the pre-majority medical expenses for Plaintiff Jorge Zamudio-Arredondo's medical care, therapies, and treatments to Plaintiff Jorge Zamudio-Arredondo.

3.      Plaintiff Jorge Zamudio-Arredondo, a minor, is a citizen of the United States and is and was a resident of the State of Colorado during all relevant times.

4.      At all times relevant hereto, Defendant Centura Health Corporation was a Colorado corporation organized under the laws of the State of Colorado with a principal business address at 9100 E. Mineral Circle, Centennial, Colorado 80112.

5.      At all times relevant hereto, Centura Health Corporation (hereinafter referred to as "Centura") owned and operated Avista Adventist Hospital (hereinafter "Avista"), located at 100 Health Park Drive, Louisville, County of Boulder, Colorado 80027.

6.      At all times relevant hereto, Bessie McLaughlin O'Dea, M.D., was a physician licensed to practice as such in the State of Colorado, holding herself out as a specialist in obstetrics and gynecology.

7.      At all times relevant hereto, Celia Tryon, R.N., was a registered nurse licensed to practice as such in the State of Colorado.

2

8.     At all times relevant hereto, Michele J. Sevcik, R.N., was a registered nurse licensed to practice as such in the State of Colorado.

9.     At all times relevant hereto, Michele N. Lewis, R.N., was a registered nurse licensed to practice as such in the State of Colorado.

10.     Defendants Avista, O'Dea, Tryon, Sevcik, and Lewis, were negligent in their care and treatment of Plaintiff as described below.

11.     The tortious conduct alleged herein occurred in Boulder County, Colorado.

12.     This Court has personal and subject matter jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

13.     Venue is proper in this Court pursuant to C.R.C.P. 98(c).

## IV.  GENERAL ALLEGATIONS

14.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

15.     On May 17, 2011, Luz Arredondo was 39 years old.

16.      On May 17, 2011, at 20:02, Luz Arredondo presented to Avista for scheduled postdate induction of labor.

17.     On May 17, 2011, at 20:12, Michele Lewis, R.N., was the nurse responsible for Luz Arredondo.

18.     On May 17, 2011, Colleen Kepner, M.D., ("Dr. Kepner") ordered continuous fetal heart rate monitoring for the entire admission.

19.     On May 17, 2011, at 20:13, Michele Lewis, R.N., interpreted and documented audible fetal heart rate located in lower right quadrant in the 170s.

20.     On May 17, 2011, at 20:15, Michele Lewis, R.N., documented that "patient states positive fetal movement."

21.     On May 17, 2011, at 20:28, Michele Lewis, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline - 150 bpm; variability - moderate; accelerations - present, 15x15; decelerations – absent.  Uterine contraction evaluation as:  duration - 140 sec; intensity - mild; contractions - occasional, irritability pattern.

22.     On May 17, 2011, at 21:00, Dr. Kepner discussed the induction process with patient.

3

23. On May 17, 2011, at 21:00, Dr. Kepner ordered: Dinoprostone (Cervidil), vaginal insert 10 mg x1, may repeat q12 hours as ordered prn. Remove upon onset of labor or 12 hours after insertion. Initial Bishop Score: 3, Ampicillin 2 gm IVPB once loading dose, follow with Ampicillin 1 gm IVPB q4hr until delivery.

24. On May 17, 2011, at 21:39, Michele Lewis, R.N., interpreted and documented her cervical exam: dilation - 0.5 cm; effacement - Station -2.

25. On May 17, 2011, at 21:43, Michele Lewis, R.N., administered Cervidil, 10 mg vaginally.

26. Cervidil is a cervical ripener used in the induction of labor.

27. On May 17, 2011, at 22:76, Michele Lewis, R.N., documented "patient is in bed, in left lateral position."

28. On May 17, 2011, at 22:47, Michele Lewis, R.N., documented "additional nurses in room to assist, position change, left tilt semi fowlers, IV rate increase."

29. On May 17, 2011, at 22:50, Michele Lewis, R.N., reviewed the strip with "charge nurse."

30. On May 17, 2011, at 23:00, Michele Lewis, R.N., interpreted and documented her fetal heart rate evaluation as: baseline – 130 bpm; variability – moderate; accelerations – present, 15x15; decelerations – prolonged. Uterine contraction evaluation as: frequency – 5.5 – 6 min; duration – 90-120 sec; intensity - mild.

31. On May 17, 2011, at 23:45, Michele Lewis, R.N., continued to observe the strip.

32. On May 17, 2011, at 23:47, Michele Lewis, R.N., increased the IV rate and changed her position to "right tilt."

33. On May 18, 2011, at 00:00, Michele Lewis, R.N., interpreted and documented her fetal heart rate evaluation as: "baseline – 145 bpm; variability – minimal; accelerations – absent; decelerations - prolonged. Uterine contraction evaluation as: frequency – 4 minutes; duration – 80-180 sec; intensity - mild."

34. On May 18, 2011, at 02:04, Michele Lewis, R.N., documented that she notified Dr. Kepner on the phone of the maternal and fetal status including late decelerations in the fetal heart rate.

35. Upon information and belief, Dr. Kepner gave no new orders and continued the Cervidil.

36. On May 18, 2011, at 07:20, Michele Sevcik, R.N., assumed care of Luz Arredondo.

4

37.   On May 18, 2011, at 07:20, Luz Arredondo was contracting every 5-6 minutes.

38.   On May 18, 2011, at 09:25, Michele Sevcik, R.N., documented that she notified Defendant O'Dea, of maternal status, fetal heart rate assessment, uterine contraction assessment and medications.

39.   On May 18, 2011, at 09:25, Defendant O'Dea confirmed the current orders; Defendant O'Dea ordered Michele Sevcik, R.N., to pull Cervidil, to conduct a sterile vaginal exam ("SVE"), and to have the patient shower and eat a light breakfast.

40.   On May 18, 2011, at 09:33, Michele Sevcik, R.N., pulled the Cervidil.

41.   On May 18, 2011, at 09:33, Michele Sevcik, R.N., documented her interpretation of her SVE as follows:  dilation – 1 cm; effacement – Station:-1.

42.   On May 18, 2011, at 9:40, Luz Arredondo was out of bed to shower.

43.   On May 18, 2011, at 10:45, Defendant O'Dea ordered one dose of Misoprostol 25 mcg, intravaginally.

44.   On May 18, 2011, at 10:58, Michele Sevcik, R.N., started Luz Arredondo on Lactated Ringers 1000 ml/Bag #3.

45.   On May 18, 2011, at 11:09, Michele Sevcik, R.N., did a cervical exam and recorded:  dilation – 4 cm; effacement – Station -2.

46.   On May 18, 2011, at 11:10, Defendant O'Dea ordered Pitocin at 1-2 milliunits/minute, increase by 1-2 milliunits/minute every 20 minutes.  Titrate to a contraction pattern of 3-4 contractions in a 10 minute period, palpating moderate to strong, or with a strength of at least 60 mmHg with an intrauterine pressure catheter.

47.   Pitocin is a labor inducing drug that causes contractions in pregnant women.

48.   Pitocin is a high risk drug. The risks of Pitocin include but are not limited to: over-stimulation of the uterus, uterine rupture, fetal distress, drop in fetal heart rate, and fetal death.

49.   Upon information and belief, at all times relevant, Avista Adventist had specific policies and procedures to ensure the safe use of Pitocin.

50.   Upon information and belief, at all times relevant, Avista Adventist's policies and procedures required that if a patient was to receive Pitocin that a physician be readily available to perform a caesarian section ("c-section"), be aware of the Pitocin induction, and be readily available to provide beside care.

51.   On May 18, 2011, at 11:24, Michele Sevcik, R.N., interpreted and documented the Pitocin pre-use checklist:  doctor order on chart; current H&P on chart; prenatal record on chart;

5

indication for induction; pelvis interpreted and documented/clinically adequate; doctor with c-section privilege aware, available, interpreted and documented; Bishop Score >6 or LIP aware.

52.    On May 18, 2011, at 11:28, Michele Sevcik, R.N., documents Pitocin titration:  1 milliunits/min IV via infusion device.

53.    On May 18, 2011, at 12:00, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – present, 15x15; decelerations – late.  Uterine contraction evaluation as:  frequency – 2-4 minutes; duration – 40-60 sec.

54.    On May 18, 2011, at 12:12, Michele Sevcik, R.N., charted "Pitocin off for now."

55.    On May 18, 2011, at 12:15, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 150 bpm; variability – moderate; accelerations – present, 15 x 15; decelerations – variable.

56.    On May 18, 2011, at 12:30, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 130 bpm; variability – minimal; accelerations – present, 15 x 15; decelerations – absent.  Uterine contraction evaluation as:  frequency – 5-6 minutes; duration – 40-60 seconds.

57.    On May 18, 2011, at 13:15, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 130 bpm; variability – moderate; accelerations – present, 15 x 15; decelerations – variable.  Uterine contraction evaluation as:  frequency – 3-5 minutes; duration – 50-80 seconds.

58.    On May 18, 2011, at 13:32, Michele Sevcik, R.N., notified Defendant O'Dea, regarding the Pitocin titration.

59.    On May 18, 2011, at 13:33, Michele Sevcik, R.N., notified Defendant O'Dea that Luz Arredondo had late decelerations and variables.

60.    On May 18, 2011, at 13:33, the Pitocin remained off.

61.    On May 18, 2011, at 14:00, Defendant O'Dea interpreted and documented that Luz Arredondo was feeling contractions, VSS + afebrile.  FHT: 135 moderate variability + variable decels.  Cardiotocography ("TOCO"): 1-5 min.  SVE: 4-5/70/-2 post.  A/P: PD1 with variable decels, FHT reassuring.

62.    On May 18, 2011, at 14:00, Defendant O'Dea ordered Pitocin restarted.

63.    On May 18, 2011, at 14:00, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 135 bpm; variability – moderate; accelerations – present, 15 x 15; decelerations – late.  Uterine contraction evaluation as:  frequency – 5-8 minutes; duration

– 40-60 seconds.

64.     On May 18, 2011, at 14:09, Defendant O'Dea documented that Pitocin was restarted.

65.     On May 18, 2011, at 14:09, Defendant O'Dea ordered "override for variable decels."

66.     On May 18, 2011, at 14:39, Michele Sevcik, R.N., restarted the Pitocin titration: 1 milliunits/min IV via infusion device.

67.     On May 18, 2011, at 15:15, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as: baseline – 130 bpm; variability – moderate; accelerations – present, 15 x 15; decelerations – absent. BP: 118/80, OL 82 bpm.

68.     On May 18, 2011, at 15:15, Pitocin was increased to 2 milliunits/min IV via infusion device.

69.     On May 18, 2011, at 15:45, Michele Sevcik, R.N., interpreted and documented her uterine contraction evaluation as: frequency – 2-3 minutes; duration – 60-80 seconds.

70.     On May 18, 2011, at 15:45, the Pitocin was increased again to 3 milliunits/min IV via infusion device.

71.     On May 18, 2011, at 16:15, Michele Sevcik, R.N., interpreted and documented that the Pitocin was not increased due to the patient requesting a continuous lumbar epidural, ("CLE") and rates pain 6-7.

72.     On May 18, 2011, at 16:20, the CRNA orders for pre-op meds to be given.

73.     On May 18, 2011, from 16:32 through 16:57, Luz Arredondo underwent the epidural procedure.

74.     On May 18, 2011, at 17:10, Michele Sevcik, R.N., intervened with oxygen via face mask at 10L, and had Luz Arredondo change position.

75.     On May 18, 2011, at 17:12, Michele Sevcik, R.N., interpreted and documented her cervical exam: dilation – 6 cm; effacement – Station -2.

76.     On May 18, 2011, at 17:12, Michele Sevcik, R.N., stopped the Pitocin.

77.     On May 18, 2011, at 17:12, Michele Sevcik, R.N., gave another bolus of lactated ringers.

78.     On May 18, 2011, at 17:15, Michele Sevcik, R.N., documented her fetal heart rate evaluation as: baseline – 135 bpm; variability – moderate; accelerations – absent; decelerations –

late.  Uterine contraction evaluation as:  frequency – 3-4 minutes; duration – 60-80 seconds.

79.     On May 18, 2011, at 17:15, Michele Sevcik, R.N., notified Defendant O'Dea about the fetal heart rate assessment.

80.     On May 18, 2011, at 17:17, a Foley catheter was inserted into Luz Arredondo's bladder.

81.     On May 18, 2011, at 18:17, Defendant O'Dea reviewed the fetal heart rate monitor and performed a vaginal exam.

82.     On May 18, 2011, at 18:18, the vaginal exam revealed dilation – 6.5 cm; effacement – Station -2.

83.     On May 18, 2011, at 18:20, Defendant O'Dea ruptured Luz Arredondo's membranes; there was no amniotic fluid.

84.     On May 18, 2011, at 18:21, Defendant O'Dea planned to recheck Luz Arredondo in 1 hour and if "no change may resume Pitocin."

85.     On May 18, 2011, at 18:45, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 150 bpm; variability – moderate; accelerations – absent; decelerations – absent. Uterine contraction evaluation as:  frequency – 3-4 minutes; duration – 50-70 seconds.

86.     On May 18, 2011, at 18:59, Michele Sevcik, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – minimal; accelerations – absent; decelerations – absent.  Uterine contraction evaluation as:  frequency – 3-4 minutes; duration – 40-60 seconds.

87.     On May 18, 2011, at 19:30, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – absent; decelerations – variable.  Uterine contraction evaluation as:  frequency – 3-4 minutes; duration – 60-70 seconds.

88.     On May 18, 2011, at 19:40, Defendant O'Dea performed a vaginal examination and interpreted it as follows: dilation – 7 cm; effacement – Station -2.

89.     On May 18, 2011, at 19:40, Defendant O'Dea placed an intrauterine pressure catheter ("IUPC").

90.     On May 18, 2011, at 20:00, Defendant O'Dea restarted Pitocin with new orders to "override fetal heart rate decelerations."

91.     On May 18, 2011, at 20:00, Defendant O'Dea noted that she believed the FHT to be reassuring.

92.    On May 18, 2011, at 20:00, Defendant O'Dea noted she believed the contractions to be inadequate.

93.    On or about 20:00 on May 18, 2011, Defendant O'Dea left the hospital.

94.    On May 18, 2011, at 20:00, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – moderate; accelerations – absent; decelerations – variable and her uterine contraction evaluation as:  frequency – 4-5 min; duration – 60-70 sec; intensity – 30-35 mmHg; resting – 10 mmHg per IUPC.  Pitocin titration:  1 milliunits/min IV via infusion device.

95.    On May 18, 2011, at 20:24, Celia Tryon, R.N., called for assistance based on the late decelerations.

96.    On May 18, 2011, at 20:24, Celia Tryon, R.N., intervened by starting a lactated ringer IV.

97.    On May 18, 2011, at 20:34, Zachary Wachtl, M.D. ("Dr. Wachtl") was at Luz Arredondo's bedside.

98.    On May 18, 2011, at 20:34, Dr. Wachtl performed a vaginal exam.

99.    On May 18, 2011, at 20:40, Dr. Wachtl placed a fetal scalp electrode ("FSE").

100.    FSE are electrodes that are inserted by twisting the electrode transducer needle under the skin of the scalp of the fetus to monitor the fetal heart rate.

101.    On May 18, 2011, at 20:45, Dr. Wachtl conducted a SVE and interpreted: 7/90/-2.

102.    On May 18, 2011, at 20:45, Dr. Wachtl ordered nurses to "gingerly titrate Pitocin. May need to do amnioinfusion."

103.    Dr. Wachtl is a physician certified in family practice medicine.

104.    Dr. Wachtl does not have c-section privileges at Avista Adventist.

105.    On May 18, 2011, at 20:45, Dr. Wachtl noted Montevideo units, 80, ("MVU") still inadequate but making slow cervical changes.

106.    On May 18, 2011, at 20:48, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – moderate; accelerations –present, 15x15; decelerations – variable.

107.    On May 18, 2011, at 21:00, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – absent; decelerations – variable.

108.    On May 18, 2011, at 21:15, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – absent; decelerations – variable.

109.    On May 18, 2011, at 21:15, the Pitocin was running at 2 milliunits/min IV.

110.    On May 18, 2011, at 21:30, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – absent; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-70 seconds; intensity – 40-50 mmHg; resting – 20 mmHg per IUPC.

111.    On May 18, 2011, at 22:00, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – moderate; accelerations – absent; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-70 seconds; intensity – 30-40 mmHg; resting – 20 mmHg per IUPC.

112.    On May 18, 2011, at 22:05, the FSE fell off and the nurses replaced the external toco monitor.

113.    On May 18, 2011, at 22:30, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 130 bpm; variability – moderate; accelerations – present, 15x15; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-70 seconds; intensity – 35-40 mmHg; resting – 20 mmHg per IUPC.

114.    On May 18, 2011, at 23:00, Celia Tryon, R.N., interpreted and documented that Luz Arredondo was in bed in the left lateral position.

115.    On May 18, 2011, at 23:00, Celia Tryon, R.N., documented her fetal heart rate evaluation as:  baseline – 130 bpm; variability – moderate; accelerations – present, 15x15; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-70 seconds; intensity – 35-40 mmHg; resting – 20 mmHg per IUPC.

116.    On May 18, 2011, at 23:30, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 135 bpm; variability – moderate; accelerations –present, 15x15; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-60 seconds; intensity – 30-50 mmHg; resting – 20 mmHg per IUPC.

117.    On May 18, 2011, at 23:45, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 145 bpm; variability – moderate; accelerations – absent; decelerations – variable and early.

118.    On May 18, 2011, at 23:58, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – moderate; accelerations – absent; decelerations – early.

119.    On May 19, 2011, at 00:00, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – moderate; accelerations – absent; decelerations – variable; her uterine contraction evaluation as:  frequency – 2-3 minutes; duration – 60-60 seconds; intensity – 30-40 mmHg; resting – 20 mmHg per IUPC.

120.    On May 19, 2011, at 00:03, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 140 bpm; variability – not interpreted and documented; accelerations – not interpreted and documented; decelerations – early.

121.    On May 19, 2011, at 00:03, Celia Tryon, R.N., doubled the Pitocin dose to 4 milliunits/min IV.

122.    On May 19, 2011, at 00:17, Celia Tryon, R.N., interpreted and documented her fetal heart rate evaluation as:  baseline – 150 bpm; variability – moderate; accelerations – not interpreted and documented; decelerations – not interpreted and documented.  FHT 150, decel down to 60.  Dr. Wachtl in room.

123.    On May 19, 2011, at 00:18, the Pitocin was turned off.

124.    On May 19, 2011, at 00:18, Celia Tryon, R.N., had Luz Arredondo change her position.

125.    On May 19, 2011, at 00:20, Celia Tryon, R.N., interpreted and documented her cervical exam: dilation – 9.5 cm; effacement – Station 0.

126.    On May 19, 2011, at 00:20, Celia Tryon, R.N., intervened with an amnioinfusion of 250 ml/hr/IUPC and gave Luz Arredondo's supplemental oxygen.

127.    On May 19, 2011, at 00:23, Dr. Wachtl attempted to place the fetal scalp electrode.

128.    According to nursing notes, on May 19, 2011, at 00:25, Defendant O'Dea was paged to the hospital for fetal distress.

129.    On May 19, 2011, at 00:25, the anesthesia providers, Lee Graham, CRNA and David A. Raphael, M.D., went to operative room ("OR") for delivery by c-section.

130.    On May 19, 2011, at 00:25, the FHT decreased to 40s.

131.    On May 19, 2011, at 00:25, they were moving Luz Arredondo to the OR for the delivery of Jorge Zamudio-Arredondo.

132.    On May 19, 2011, at 00:29, Celia Tryon, R.N., interpreted and documented her fetal heart tones in the 40s.

133.    On May 19, 2011, at 00:30, Celia Tryon, R.N., was in the OR attempting to find fetal heart tones with an ultrasound.

134.    On May 19, 2011, at 00:32, Tammy Piccone, R.N., interpreted and documented her cervical exam: dilation – 10 cm; effacement – Station +1.

135.    On May 19, 2011, at 00:33, the anesthesia notes indicate three attempts to deliver vaginally with vacuum extractions.

136.    On May 19, 2011, at 00:34, Celia Tryon, R.N., placed a fetal scalp electrode.

137.    On May 19, 2011, at 00:34, Luz Arredondo was 10 cm dilated and the baby was at +1 station.

138.    On May 19, 2011, at 00:35, Dr. Wachtl removed the FSE and placed the vacuum extractor; the first pull resulted in a "pop off."

139.    According to nursing notes, on May 19, 2011, at 00:37, Defendant O'Dea called in from her car, en route to the hospital, claiming to be approximately 5 minutes away.

140.    On May 19, 2011, at 00:38, Dr. Wachtl placed the vacuum extractor the second time; the second pull resulted in a second "pop off."

141.    On May 19, 2011, at 00:40, Dr. Wachtl placed the vacuum extractor for the third time; the third pull resulted in a third "pop off."

142.    On May 19, 2011, Dr. Wachtl noted that there was no fetal descent with pushing.

143.    According to nursing notes, on May 19, 2011, at 00:41, Daniel Austin, M.D. ("Dr. Austin") was walking into the hospital to see a different patient.

144.    According to nursing notes, on May 19, 2011, at 00:41, Dr. Wachtl asked Dr. Austin to perform the emergent c-section on Luz Arredondo.

145.    According to nursing notes, on May 19, 2011, at 00:43, Dr. Austin made the first incision.

146.    According to nursing notes, on May 19, 2011, at 00:45, Jorge Zamudio-Arredondo was born.

147.    Defendant O'Dea arrived after Dr. Austin delivered Plaintiff, Jorge Zamudio-Arredondo and the placenta.

148.    On May 19, 2011, at 02:00, Dr. Wachtl documented, "I was speaking to patient in room when she began to have deceleration. Stepped out of room and met nurse coming down hallway. Returned to room, Pitocin turned off. Fetal heart tones began to recover. Tried position change and oxygen and amnioinfusion. SVE: 9.5/100/0. Fetal heart tones of fetal scalp electrode: 40-50. Called for emergency surgery to POC and both verbally agree. In OR nurse removing IUPC noted station at lower 2+. As I was awaiting OB, I tried vacuum assisted delivery. 3 pushes

with 3 pop offs, very little movement of fetal head.  OB arrived and proceeded with emergent c-section."

149.     On May 19, 2011, at 02:00, Defendant O'Dea documented that she was "called in for bradycardia.  On arrival baby delivered and assisted with remainder of c-section.  No obvious cause for abrupt bradycardia following reassuring fetal heart tone.  Spoke with patient and father of baby, discussed op findings, need for resuscitation and close observation of baby.  Routine post op care of patient."

150.     On May 20, 2011, Plaintiff, Jorge Zamudio-Arredondo was transferred to Rocky Mountain Hospital for Children for additional care for his hypoxic ischemic encephalopathy.

151.     As a direct and proximate result of the negligence of the Defendants, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations, rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

152.     Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages.

## V.  FIRST CLAIM FOR RELIEF
### (Centura Health Corporation d/b/a Avista Adventist Hospital – *Direct Negligence*)

153.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

154.     Defendant Centura, as the operator of Avista Adventist Hospital, had a special relationship with, and owed a special duty of care to its patients, including the Plaintiff.

155.     At all relevant times, Defendant Centura was under an affirmative duty to exercise reasonable care in operating Avista Adventist Hospital, including but not limited to developing, implementing, and enforcing training to protecting the safety of patients in all aspects of facility operations.

13

156.   At all relevant times, Defendant Centura breached their duty and were negligent, by, *inter alia*:

a.  Failing to appropriately educate, train, prepare, and monitor the staff at Avista, including but not limited to nurses, on appropriate management of labor and delivery care, including, but not limited to, documentation, medication administration, medication errors, fetal monitoring, management of Pitocin-induced labor, recognizing signs and symptoms of fetal distress, and physician notification;

b.  Failing to train staff to only allow credentialed physicians to practice medicine within their approved areas of practice;

c.  Failing to appropriately educate, train, prepare, and monitor the staff at Avista, including but not limited to nurses, on the importance of complying with all patient care policies and procedures, including, but not limited to, those related to patient observation, medication administration, and assessment/reassessment of patients, Pitocin induced or augmented labor;

d.  Failing to ensure that the staff at Avista, including but not limited to the nurses, had adequate training and experience to identify changes in patient condition and take timely, appropriate steps including, but not limited to, following hospital policies and procedures for patient safety;

e.  Failing to ensure adequate policies and procedures were instituted for patient safety;

f.  Failing to adequately enforce policies and procedures for patient safety;

g.  Failing to ensure a physician with c-section privileges was present in the labor and delivery suite;

h.  Failing to ensure a back-up obstetrician with c-section privileges was readily available;

i.  Failing to ensure a deck doctor was present in the labor and delivery suite;

j.  Failing to ensure a physician with c-section privileges was readily available;

k.  Failing to appropriately educate, train, prepare, and monitor the staff at Avista, including but not limited to nurses, on appropriate management of labor and delivery care, including, but not limited to, medication administration, medication errors, fetal monitoring, recognizing signs and symptoms of fetal distress, and physician notification;

l.  Failing to ensure that physicians practiced medicine within the scope of their credentials with Avista;

m.  Failing to ensure that the staff at Avista, including, but not limited to, the nurses, timely and appropriately monitored, interpreted and documented and responded to medication responses; and,

n.  Failing to ensure that the staff at Avista, including but not limited to the nurses, had adequate training and experience to identify changes in patient condition and take timely, appropriate steps including but not limited to following hospital policies and procedures for patient safety.

157.  As a direct and proximate result of the negligence of Defendant Centura, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations, rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

158.  Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages.

## VI.  SECOND CLAIM FOR RELIEF
### (Bessie McLaughlin O'Dea, M.D. – *Negligence*)

159.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160.  Between on or about May 17, 2011, and May 18, 2011, Luz Arredondo and Jorge Zamudio-Arredondo came under the care and treatment of Defendant O'Dea for management and treatment, including induction, labor and delivery.

161.  Defendant O'Dea was negligent in her care and treatment of Luz Arredondo and Jorge Zamudio-Arredondo, and, as a direct and proximate result, Jorge Zamudio-Arredondo suffered permanent severe injuries, damages, and losses.

15

162.   As a licensed physician specializing in obstetrics and gynecology, Defendant O'Dea owed a duty to Luz Arredondo and Jorge Zamudio-Arredondo to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of physicians under the same or similar circumstances.

163.   Defendant O'Dea breached her duty and was negligent with regard to the care and treatment of Luz Arredondo and Jorge Zamudio-Arredondo by, including, but not limited to, the following:

a.   Failing to reasonably assess Luz Arredondo and Jorge Zamudio-Arredondo;

b.   Failing to reasonably monitor, diagnose and treat Luz Arredondo and Jorge Zamudio-Arredondo;

c.   Failing to reasonably titrate Pitocin, discontinue the Pitocin, and to provide acceptable Pitocin Orders for the nursing staff;

d.   Failing to timely apprise herself of the condition of mother and fetus;

e.   Failing to provide adequate and timely direction and supervision to the nursing staff, including the failure to impart and communicate appropriate orders and direction to the nursing staff;

f.   Failing to timely respond to repeated and recurrent decelerations in the fetal heart;

g.   Failing to timely attend the laboring patient and her fetus;

h.   Failing to ensure that a physician with c-section privileges was aware and readily available when she left the hospital;

i.   Failing to reasonably monitor the fetal heart tones;

j.   Failing to timely and reasonably perform a c-section;

k.   Failing to reasonably manage the labor and delivery;

l.   Failing to adhere to the policies and procedures regarding the use of Pitocin-augmented labor;

m.   Leaving a laboring postdates patient on Pitocin with no physician in house to perform a c-section delivery;

n.   Failing to provide reasonable care; and,

16

o.  Failing to remain in the hospital to be readily available to provide a c-section delivery.

164.    As a direct and proximate result of the negligence of Defendant O'Dea, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations, rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

165.    Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages.

## VII.  THIRD CLAIM FOR RELIEF
### (Michele Lewis, R.N. – *Negligence*)

166.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

167.    Between on or about May 17, 2011, and May 18, 2011, Luz Arredondo and Jorge Zamudio-Arredondo came under the care and treatment of Defendant Lewis.

168.    While under the care and treatment of Defendant Lewis, Plaintiff suffered injuries, damages, and losses.

169.    As a nurse, Defendant Lewis owed a duty to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of nurses under the same or similar circumstances.

170.    Defendant Lewis deviated from that standard of care and was negligent by, including, but not limited to, the following:

a.  Failing to reasonably assess Luz Arredondo and her baby;

b.  Failing to reasonably monitor Luz Arredondo and her baby;

17

.

    c.   Failing to accurately interpret, accurately document, and accurately and timely report maternal and fetal status to the physician;

    d.   Failing to intervene with fetal resuscitative measures and timely report to the physician;

    e.   Failing to titrate and/or discontinue Pitocin and report to the physician;

    f.   Following Orders of the physician to continue to increase the Pitocin when she knew or should have known the detrimental effects being caused to the fetus;

    g.   Failing to timely recognize the baby was not tolerating Pitocin;

    h.   Failing to recognize the signs and symptoms of fetal distress;

    i.   Failing to follow hospital policies and procedures including the policies regarding Pitocin use;

    j.   Failing to take reasonable actions regarding the fetal heart tones and contraction pattern;

    k.   Failing to reasonably advocate on behalf of her patient; and,

    l.   Failing to provide reasonable care.

171.    As a direct and proximate result of the negligence of Defendant Lewis, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations, rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

172.    Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages

## VIII.  FOURTH CLAIM FOR RELIEF
### (Michele Sevcik, R.N. – *Negligence*)

173.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

174.   Between on or about May 17, 2011, and May 18, 2011, Luz Arredondo and Jorge Zamudio-Arredondo came under the care and treatment of Defendant Sevcik.

175.   While under the care and treatment of Defendant Sevcik, Plaintiff suffered injuries, damages, and losses.

176.   As a nurse, Defendant Sevcik owed a duty to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of nurses under the same or similar circumstances.

177.   Defendant Sevcik deviated from that standard of care and was negligent by, including, but not limited to, the following:

a.   Failing to reasonably assess Luz Arredondo and her baby;

b.   Failing to reasonably monitor Luz Arredondo and her baby;

c.   Failing to accurately interpret, accurately document, and accurately and timely report maternal and fetal status to the physician;

d.   Failing to intervene with fetal resuscitative measures and timely report to the physician;

e.   Failing to appropriately titrate and/or discontinue Pitocin and report to the physician;

f.   Following Orders of the physician to continue to increase the Pitocin when she knew or should have known the detrimental effects being caused to the fetus;

g.   Failing to timely recognize the baby was not tolerating Pitocin;

h.   Failing to recognize the signs and symptoms of fetal distress;

i.   Failing to follow hospital policies and procedures including the policies regarding Pitocin use;

j.   Failing to take reasonable actions regarding the fetal heart tones and contraction pattern;

19

    k.  Failing to reasonably advocate on behalf of her patient;

    l.  Failing to go up the chain of command; and,

    m.  Failing to provide reasonable care.

178.    As a direct and proximate result of the negligence of Defendant Sevcik, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations, rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

179.    Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages.

## IX. FIFTH CLAIM FOR RELIEF
### (Celia Tryon, R.N. – *Negligence*)

180.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

181.    Between on or about May 17, 2011, and May 18, 2011, Luz Arredondo and Jorge Zamudio-Arredondo came under the care and treatment of Defendant Tryon.

182.    While under the care and treatment of Defendant Tryon, Plaintiff suffered injuries, damages, and losses.

183.    As a nurse, Defendant Tryon owed a duty to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of nurses under the same or similar circumstances.

184.    Defendant Tryon deviated from that standard of care and was negligent by, including, but not limited to, the following:

    a.  Failing to reasonably assess Luz Arredondo and her baby;

20

b.  Failing to reasonably monitor Luz Arredondo and her baby;

c.  Failing to accurately interpret, accurately document, and accurately and timely report maternal and fetal status to the physician;

d.  Failing to intervene with fetal resuscitative measures and timely report to the physician;

e.  Failing to appropriately titrate and/or discontinue Pitocin and report to the physician;

f.  Following Orders of the physician to continue to increase the Pitocin when she knew or should have known the detrimental effects being caused to the fetus;

g.  Failing to timely recognize the baby was not tolerating Pitocin;

h.  Increasing the Pitocin dosage when the baby was not tolerating Pitocin;

i.  Failing to recognize the signs and symptoms of fetal distress;

j.  Failing to follow hospital policies and procedures, including the policies regarding Pitocin use;

k.  Failing to take reasonable actions regarding the fetal heart tones and contraction pattern;

l.  Failing to reasonably advocate on behalf of her patient;

m.  Failing to go up the chain of command and for, including but not limited to, failing to initiate the chain of command policy when there was a laboring postdates patient on Pitocin with no physician with c-section privileges reasonably available; and,

n.  Failing to provide reasonable care.

185.    As a direct and proximate result of the negligence of Defendant Tryon, Jorge Zamudio-Arredondo has and will suffer past and future economic losses, past and future non-economic losses, past and future disfigurement damages, and past and future physical impairment damages. Jorge Zamudio-Arredondo has suffered significant and permanent brain injury and dysfunction, physical impairment and disfigurement, loss of speech, emotional distress, mental anguish, and physical suffering. Jorge Zamudio-Arredondo's injuries have been and will continue to be disabling, incapacitating, and humiliating. Jorge Zamudio-Arredondo's injuries are permanent. Jorge Zamudio-Arredondo has suffered a loss of earning capacity for the future. Jorge Zamudio-Arredondo has suffered and will suffer a loss of the ability to enjoy a normal life. These losses further include, but are not limited to, expenses for physicians, hospitalizations,

rehabilitation and related medical care and treatment. Jorge Zamudio-Arredondo has incurred, and will incur in the future, expenses for physicians, medical procedures, medications, hospitalizations, rehabilitation, therapies, educational costs, long term care and assistance, and related medical care and treatment.

186.   Plaintiff claims all past and future economic damages, past and future non-economic damages, past and future physical impairment damages, and past and future disfigurement damages.

WHEREFORE, Plaintiff respectfully prays for compensatory damages in favor of the Plaintiff and against the Defendants in an amount to be determined by the trier of fact, all interest allowed by law including all prejudgment interest, all pre-filing interest, and all post judgment interest, expert witness fees, filing fees, deposition expenses, and for all other costs and expenses as allowed under law, and for such other and further relief as this Court may deem appropriate.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 16th day of July, 2019.

LEVENTHAL & PUGA, P.C.

By: */s/ Alex R. Wilschke*
    James E. Puga, #18960
    Alex R. Wilschke, #36323
    *Attorneys for Plaintiff*

Plaintiff's Address:
2901 W. 63rd Ave, Lot 85
Denver, Colorado 80221

| | |
|---|---|
| BOULDER COUNTY COMBINED COURT<br>STATE OF COLORADO<br><br>**Court Address:**<br>1777 6th Street<br>Boulder, Colorado 80302 | DATE FILED: July 16, 2019 4:57 PM<br>FILING ID: 2EFD1D15B4731<br>CASE NUMBER: 2019CV30693 |
| **Plaintiff:**<br>Jorge Zamudio-Arredondo, a minor, by and<br>through his Mother and Next Friend, Luz<br>Arredondo Fierro<br><br>v.<br><br>**Defendant:**<br>Centura Health Corporation d/b/a Avista<br>Adventist Hospital; Bessie McLaughlin O'Dea,<br>M.D.; Celia Tryon, R.N.; Michele J. Sevcik,<br>R.N.; and Michele N. Lewis, R.N. | |
| | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>James E. Puga, Esq., #18960<br>Alex R. Wilschke, Esq., #36323<br>Leventhal & Puga, P.C.<br>950 South Cherry Street, Suite 600<br>Denver, Colorado 80246<br>Phone Number:   (303) 759-9945<br>FAX Number:   (303) 759-9692<br>E-mail:   jpuga@leventhal-law.com<br>E-mail:   awilschke@leventhal-law.com | **Case Number:**<br><br>**Division:**<br>**Courtroom:** |
| **DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND** | |

1.  This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.  Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

    ☐ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

JDF 601SC R09-18 DISTRICT COURT CIVIL (CV) CASE COVER SHEET      Page 1 of 2

☑ This party is seeking a monetary judgment against another party for more than $100,000.00, including any penalties or punitive damages, but excluding attorney fees, interest and costs, as supported by the following certification:

By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000."

Or

☐ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ☑ This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38. (Checking this box is optional.)

Date: July 16, 2019            /s/ Alex R. Wilschke, #36323
                                           Signature of Party or Attorney for Party

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, cross-claim, or third party complaint.

| | |
|---|---|
| **BOULDER COUNTY COMBINED COURT**<br>STATE OF COLORADO<br>**Court Address:**<br>1777 6th Street<br>Boulder, Colorado 80302 | DATE FILED: July 22, 2019 4:29 PM<br>FILING ID: 60D5DA10FBF83<br>CASE NUMBER: 2019CV30693 |
| **Plaintiff:**<br>Jorge Zamudio-Arredondo, a minor, by and through his Mother and Next Friend, Luz Arredondo Fierro<br><br>v.<br><br>**Defendants:**<br>Centura Health Corporation d/b/a Avista Adventist Hospital; Bessie McLaughlin O'Dea, M.D.; Celia Tryon, R.N.; Michele J. Sevcik, R.N.; and Michele N. Lewis, R.N. | |
| **Attorneys for Plaintiff:**<br>James E. Puga, Esq., #18960<br>Alex R. Wilschke, Esq., #36323<br>Leventhal Puga Braley, P.C.<br>950 South Cherry Street, Suite 600<br>Denver, Colorado 80246<br>**Phone Number:**   (303) 759-9945<br>**FAX Number:**   (303) 759-9692<br>**E-mail:**   jpuga@leventhal-law.com<br>      awilschke@leventhal-law.com | ▲**COURT USE ONLY**▲<br><br>**Case Number:**  2019CV030693<br><br>**Division:**  5<br>**Courtroom:**   L |
| **NOTICE OF FIRM NAME CHANGE** | |

PLEASE TAKE NOTICE that the attorneys for Plaintiff, previously known as Leventhal & Puga, P.C., submit the following notice of firm name change. Effective July 22, 2019, all correspondence, pleadings, and/or documents should be submitted to the firm information listed below. Please note that our telephone and fax numbers and e-mail addresses remain the same.

Leventhal Puga Braley, P.C.
950 S. Cherry St., Suite 600
Denver, CO  80246

Respectfully submitted this 22nd day of July, 2019.

LEVENTHAL PUGA BRALEY, P.C.

By:   /s/ *Alex R. Wilschke*
      James E. Puga, #18960
      Alex R. Wilschke, #36323
      *Attorneys for Plaintiff*

## CERTIFICATE OF MAILING

It is hereby certified that a true and correct copy of the foregoing document was electronically filed via Colorado Courts E-Filing, on this 22nd day of July, 2019.

*/s/ Doreen D. Benavidez*